Susan Elaine Meadlock
KAHN, Appellee,

v.

Siegfried KAHN, Appellant.

Supreme Court of Tennessee.

Aug. 22, 1988.

Tyree B. Harris, IV, Katherine A. Brown, Harris & Harris, Nashville, for appellee.

John J. Hollins, Deborah B. Willis, Hollins, Wagster & Yarbrough, P.C., Nashville, for appellant.

## OPINION

FONES, Justice.

We granted the husband's Rule 11 application in this divorce case to examine the validity of the antenuptial agreement and the differences in the awards to the wife by the trial court and the Court of Appeals.

At the time of the marriage, 17 December 1982, husband was 63 years old and wife was 26 years old. The parties separated exactly two years and two months later, on 17 February 1985. Wife filed a complaint for divorce on 8 March 1985, alleging irreconcilable differences and cruel and inhuman treatment. Husband filed an answer and a counterclaim for divorce on the same grounds.

The trial judge awarded wife a divorce on the ground of cruel and inhuman treatment. She received custody of the parties' son, born in January 1984, $5,000 per year for three years as rehabilitative alimony, $60,000 alimony in solido, payable in $20,000 annual installments, $15,000 to purchase an automobile, and the exclusive use of the Harding House condominium "as provided in the antenuptial property agreement". The antenuptial agreement provided that in the event of divorce husband would provide wife with a two bedroom house or condominium for as long as she resided therein or until she remarried. The trial judge also awarded wife all the right, title and interest to all of the furnishings in the Harding House condominium at the time of the decree.

The trial court's decree also provided for child support of $500 per month plus all expenses for education and medical treatment and $5,000 attorney's fee to wife's attorney.

The Court of Appeals declared the antenuptial agreement void because husband failed to make a full disclosure of his wealth immediately prior to the execution of the agreement and because the provisions made for wife in the event of death or divorce were wholly disproportionate to husband's net worth. The intermediate court awarded wife $180,000 alimony, payable in monthly installments of $5,000 to be fully paid by 30 April 1989, and fee simple title to the Harding House condominium and its furnishings as well as ordering husband to pay off the mortgage in the approximate sum of $38,745. That court found that an incomplete home under construction that no one had ever lived in, purchased entirely by husband and titled in his name alone, had appreciated in value in the sum of $327,000 between its purchase in August 1983 and the time of trial. The Court of Appeals found that the appreciation resulted from the joint efforts of husband and wife because she dealt with the architect and selected furnishings and awarded her a lump sum of $163,500, one-half of the appreciation. Child support was increased to $1,500 per month but the attorney's fee award was vacated because of the absence of proof as to the services rendered and because wife had sufficient resources to pay her attorney after the modifications made by the Court of Appeals.

We reverse the Court of Appeals and reinstate the decree of the trial court with two changes. As additional alimony, wife is awarded fee simple title to the Harding House condominium and husband is directed to pay the mortgage indebtedness and remove the lien. The award for wife's attorney is increased to $25,000 for services in all three courts.

## I.

Husband owns all of the stock in Fred S. Kahn Company. That corporation owns

four hosiery manufacturing plants in North Carolina. Husband is the chief executive officer of the corporation and apparently personally accounts for most of the sales. He travelled extensively and frequently stayed at a hotel in Hickory, North Carolina, where wife was employed as a waitress. Wife testified that she "knew him for approximately one year before we became romantically involved." He became interested in her, left $25 and $30 tips for service at breakfast and began asking her to have dinner with him. They began going out together in April 1981 and in July 1981 she moved to Nashville where they lived in his Harding House condominium. At that time she was separated from her second husband and they had a divorce action pending. Her daughter Carrie, by a previous marriage, lived with them.

Husband was very generous. He gave her the use of a company car, credit cards, and such spending money as she requested. Wife frequently acknowledged his generosity throughout their live-in and marital relationship. He bought her jewelry and furs and paid Carrie's tuition and expenses at a private school.

Marriage was discussed and in March 1982 husband gave wife an engagement ring but wanted the wedding delayed until fall to coincide with his parent's anniversary. She moved out of the condominium temporarily on more than one occasion, prompted by his apparent disinterest in marriage. The Court of Appeals noted that her desire to be married was "somewhat stronger than his."

The marriage took place on 17 December 1982, and their life together continued for a short time in the same lavish style as before. The parties discussed having a child but admittedly made no decision to do so. Wife resolved the stalemate by ceasing to take her birth control pills without advising husband. Their son Phillip was born in January 1984.

However, in time their widely divergent interests began to erode their relationship and soon led to their separation and these divorce proceedings. Wife complained that all husband wanted to do was have dinner at the country club with his friends and that he did not like any of her friends and did not want her to associate with any of her friends.

Husband complained that she preferred the company of women near her own age, she liked to go out with her friends to Ziggy's, the Steeplechase and Cajun's Wharf. They enjoyed rock and roll music and disco dancing. At least one of the female friends used drugs. She was an employee of husband's company, was suspected of embezzling $120,000 and was discharged. Wife admitted using cocaine on one occasion and smoking marijuana. Wife and her female friends would stay out until 3:00 a.m. or 4:00 a.m. On some occasions when husband was in Nashville, she would be too intoxicated to risk driving home and would spend the night with one of her friends. When husband was out-of-town on business, wife's female friends would sometimes spend the night with her. They shared the same bed but she denied any improper relationship.

Husband did not like rock and roll music and did not like to go to Ziggy's, the Steeplechase or Cajun's Wharf. He did not think that "in the eyes of the community" it was respectable behavior for his wife to frequent those places with her female friends until the early morning hours; neither did he think it was safe because of the drug use and disturbances he had observed at those establishments. Husband and wife had a frank discussion about his views while vacationing in Acapulco in October 1984 and wife said that if that was such a problem with him she would cease going out with those friends to those places. He testified that during the week following their return from Acapulco she was out three nights until the early morning hours with a female friend. Wife testified that she only went to lunch with her female friends after the Acapulco discussion.

Wife testified that in December 1984 husband told her that if they could not live together in harmony he wanted a divorce and custody of Phillip. She attempted suicide by taking husband's medication, after which she threw the bottle at him. She

was in the hospital about five days under the care of Dr. Rice, a psychiatrist that she had been seeing professionally for about two months.

The parties continued to live at the same address until 17 February 1985, when husband sent an employee to get some of his clothes and moved out. They have lived apart since that date. Reconciliation was discussed on a few occasions without success.

It is this Court's opinion, after a careful reading of the record, that fault is almost evenly divided between husband and wife. However, both courts below have found that husband was guilty of cruel and inhuman treatment and we will not disturb that adjudication, nor the award of child custody.

## II.

On 16 December 1982, the day before the parties were married, they executed an antenuptial property agreement. Each party released all marital rights in the estate of the other in the event of death and provided that each party would have complete control of their respective separate properties after marriage, whether then owned or thereafter acquired.

In the event of divorce each party released any claim to the separate property of the other. However, husband agreed to provide "an adequate two bedroom house or condominium for Susan Beam so long as she resides in the house or condominium or until she remarries." That the provision for wife "shall be treated as alimony ... and this shall be the only alimony that she would be entitled to."

Wife described the circumstances surrounding the execution of the agreement as follows:

Q. When is the first time that you saw the prenuptial agreement?

A. The day before we married, the 16th of December.

Q. When is the first time that the subject of a prenuptial agreement was mentioned to you?

A. I am really not sure. I know the week before we married, the date had been set, and I was trying to discuss it with him like we needed blood tests and we needed [a] marriage license, and he wouldn't even discuss it with me. And I became very upset and I said, I have been with you for a year and a half. If at this point in time you don't feel like you want to marry me, then I am going to go back to Taylorsville and resume my life there.

Q. When, then, was the subject of the prenuptial agreement first discussed?

A. I think it must have been the week before we married.

Q. What if anything did Mr. Kahn tell you about a prenuptial agreement in general?

A. He said that he would feel more comfortable if I signed a prenuptial agreement.

Q. Was that the extent of the statement that he made to you?

A. Yes.

Q. During the week between the time it was first discussed and the document was executed on the day before you were married, did you consult the services of an attorney?

A. No, I did not.

Q. Where did you execute this prenuptial agreement, Mrs. Kahn?

A. It was at the office of his attorney at the time, Wayne LeRoy.

Q. At the time that this document was presented to you, did either Mr. Kahn or his attorney in Mr. Kahn's presence make any statement to you or provide you with any document—

A. No.

Q. —which purported to set forth or detail the holdings which Mr. Kahn considered to be within the confines of the prenuptial agreement?

A. No, he did not.

Q. Was anything of that nature discussed?

A. Not prior to the signing of the prenuptial agreement. As I said, when we began dating, he told me he had this

and he had that. But, no, nothing was said during that time.

Q. You're talking about at or about April of 1981?

A. When we first started dating he was trying, I suppose, to impress me.

Q. But not in December of '82?

A. No.

Q. Was the subject of the extent of his holdings or a detailing of his holdings in anyway discussed—

A. No, not at all.

Q.—between the time the prenuptial agreement—the content of a prenuptial agreement was first brought to your attention and the time that you signed that document?

A. No, not at all. My husband told me that everyone thought that I wanted to marry him for his money. And that he would feel more comfortable with a prenuptial agreement.

A. And I said, if that is what you need, then fine, I'll sign it.

Q. Did you and Mr. Kahn discuss the fact of whether or not you were marrying him for his money?

A. He apparently—he said he knew that I wasn't. He told his sisters that he knew better. That he loved me.

Husband's testimony with regard to the execution of the agreement follows:

Q. Do you recall the circumstances, Mr. Kahn, relating to the signing of the antenuptial agreement?

A. Yes, I do.

Q. What had you told your wife, if anything—I am going to hand you Exhibit 4 to Mrs. Kahn's deposition. What had you told your wife, if anything, with regard to the nature and extent of your assets at the time she signed this?

A. I advised her that my net worth could be in the area of 7 to 9 million dollars contingent on certain business conditions, liability of certain equipment. But within the neighborhood, I felt very safe that the assets of the manufacturing and the inventories would—they would be worth 7 to 9 million dollars.

Q. Did you tell her about what your annual income was?

A. Yes.

Q. Both from investment and from your employment?

A. Yes. As a matter of fact, she co-signed my W-2 form—my tax 1040.

Q. She didn't do that before you got married?

A. Before I got married, no.

Q. We are talking about now before you got married. Did you discuss this prenuptial agreement with her?

A. Yes, very definitely.

Q. She has testified that you didn't use any duress, you didn't threaten her in any way to get her to sign it?

A. That's correct.

Q. She testified that she told you all she wanted in the event of a divorce was a place for her daughter to live, is that correct?

A. That is correct, sir.

Q. Examine that document. See if it bears your signature.

A. Yes, it does.

Q. Did you ever at any time try to underestimate the value of your assets in order to induce her to sign that agreement?

A. Not at all.

Q. Did she read it before she signed it?

A. Yes. As a matter of fact, Wayne LeRoy advised Susan over and over again, Susan, is there anything in here which you do not understand, or you do not want to go along with it, let me know, and we'll change it accordingly. And when this was presented to her for her signature she was very happy with it and signed it. However, the lawyer did emphatically tell her, if there is anything you'd like to have done different, we'll draft it and see whether it can be acceptable to both parties.

He said, I want it to be fair to both of you. Hopefully that you'd never have to use it, but still want to have the condition of it fair.

On cross examination with respect to the execution of the agreement and financial

disclosure of husband's assets, wife testified as follows:

Q. I am going to hand you a document, Mrs. Kahn, and ask you if you are able to identify it?

A. Yes.

Q. Was that document made an exhibit to your discovery deposition which was taken on June 18th, 1985?

A. Yes, it was.

Q. What is that document?

A. It is a antenuptial property agreement.

Q. Did you testify in your discovery deposition that you signed it freely, voluntarily, knowledgeably, without duress or threat?

A. Mr. Kahn told me that he would feel more comfortable if I signed it.

Q. You must have misunderstood my question. Did you testify that you signed this freely and voluntarily and without any threat of physical harm?

A. Yes.

Q. Did you also testify that you knew this document applies to all the property that each of you owned at the time you signed it?

A. Yes.

Q. Did you tell me in this deposition prior to signing this document that Mr. Kahn had told you that he had four plants and was worth millions of dollars?

A. Mr. Kahn told me that back in April and May of 1981 when we first started dating. But before, if you're speaking before this was signed, there was no discussion as to what he had or didn't have. He just said, I would feel more comfortable if you would sign this.

Q. Yes, but it was prior to the signing of the document that he had told you that he had four plants and was worth millions of dollars?

A. This is true. A year and a half before.

Q. Had you seen the plants?

A. Yes.

Q. And you knew that he owned them?

A. I assumed that he did. He told me he did.

Q. Right. And he told you that he was making around $360,000 a year from all his investments?

A. Yes, he told me that, also.

Q. So, Mr. Kahn didn't try to hide his net worth from you at any time?

A. No.

Q. After the marriage, did you ask Mr. Kahn to tear up this prenuptial agreement?

A. Yes, I did.

Q. Why did you ask him to do that?

A. Because I was very angry at him because he had left me. And I needed to know that he trusted me. And apparently he didn't.

Q. When you signed the prenuptial agreement or immediately before signing the prenuptial agreement, Mrs. Kahn, didn't you tell Mr. Kahn that the only thing that you wanted in the event of a divorce was a place for you and your daughter to live?

A. That's correct.

Q. And that is in the agreement, is it not?

A. Pardon?

Q. That is in the agreement?

A. Yes.

Q. Did you tell him that you wanted anything else in the event you got a divorce?

A. No.

On cross examination, husband testified about his disclosures to wife as follows:

Q. Mr. Kahn, when you first met Mrs. Kahn-to-be, did you make any statements or representations to her about the state of your assets or your wealth?

A. I did.

Q. What did you say to her?

A. I told her that I was worth approximately 8 to 9 million dollars.

Q. Eight to nine million dollars. Now, would this have been in April of 1981?

A. Oh, I don't know exactly what date it was. Whether it was in April or

whether it was in May. And I also know that I have no recollection of that.

Q. Well, rather than fret about exactly when it was said, can we both agree that it was at or about the time that you all met and started dating?

A. It was done at the time she and I were living together.

Q. So, that would have been at or about July of 1981?

A. That's correct.

Q. What if anything else did you tell her, in particular about the state or condition of your wealth and the basis for that?

A. Well, the basis of the wealth were the manufacturing plant.

Q. I am not asking for a statement of what it was, Mr. Kahn. I am asking you for what you told Mrs. Kahn-to-be about the basis of your wealth.

MR. HOLLINS: He is trying to answer it and you cut him off.

THE WITNESS: The basis of my wealth were the manufacturing plants, and ratings in credit ratings books, conversations which took place among my clients while Susan was present, conversation among a broker who had suggested that he may have a client.

Q. (BY MR. HARRIS) What kind of client?

A. A client, a broker who tries to develop business to sell business on a commissioned basis.

Q. You are talking about selling your manufacturing concern?

A. Yeah.

Q. Anything else?

A. Basically, that's it.

Q. Did you tell her about any real property that you owned?

A. Yes, I did.

Q. Anything else?

A. Retirement funds which were due to me.

Q. Anything else?

A. I believe that's basically it.

Q. Okay. Did you and Mrs. Kahn-to-be have any further conversations about this subject matter between July of 1981 and the time of your marriage?

A. No.

Q. So, your statement to the Court that your wife-to-be knew of your estate in detail at the time of her execution of an antenuptial agreement was in fact based upon your conversations of July of 1981?

A. That's correct.

\*    \*    \*    \*    \*    \*

Q. Mr. Kahn, was there any substantial asset that you held in July of 1981 that you did not hold in December of 1982?

A. I wouldn't think so.

Q. So, the nature of your estate remained essentially the same, is that your testimony?

A. Approximately.

Q. Had the valuation of your estate suffered a dramatic increase or decline between July of 1981 and December of 1982?

A. No, it hadn't.

There have been very few cases brought to this Court wherein the issue that controlled the validity of an antenuptial agreement was whether the husband had made a sufficient disclosure of his assets, liabilities and net worth. One of the earliest cases was *Spurlock v. Brown*, 91 Tenn. 241, 18 S.W. 868 (1892). Neither the facts nor the law applied in that case provide any precedent for our decision in this case. The court dealt with a number of issues and concluded that the antenuptial agreement "was not fairly obtained, and therefore we cannot sustain it as an equitable bar to her rights." *Id.* at 264, 18 S.W. 868.

The court found that Spurlock had led his wife to believe that he had large debts and little net worth when in fact he was worth about one hundred thousand dollars. Under the agreement she relinquished her interest in his estate which would have been approximately fifty thousand dollars, for a life estate in a house and lot worth six thousand dollars. In addition she had loaned Spurlock her life savings of approximately thirty-seven hundred dollars for

which he gave a note, but under the law at that time her property became his by virtue of the marriage. The court found as an additional inequity that Spurlock, who had been her business advisor for a number of years prior to their engagement and marriage, had failed to advise her, or have his lawyer advise her, that her property became his upon marriage.

The rule governing disclosure required to validate antenuptial agreements was announced by the Court of Appeals in *Baker v. Baker*, 24 Tenn.App. 220, 142 S.W.2d 737 (1940) as follows:

> The rule supported by the weight of authority may be stated thus: An engagement to marry creates a confidential relation between the contracting parties and an antenuptial contract entered into after the engagement and during its pendency must be attended by the utmost good faith; if the provision for the prospective wife is, in the light of surrounding circumstances, wholly disproportionate to the means of her future husband and to what she would receive under the law, the burden rests on those claiming the validity of the contract to show that there was a full disclosure of the nature, extent and value of the intended husband's property, or that she had full knowledge thereof without such disclosure, and that she, with this knowledge, voluntarily entered into the antenuptial settlement. [Citations omitted.]
>
> It should be noted that under this rule the contract is not invalidated merely because the portion fixed for the bride is small or disproportionate, for, if fully informed and advised, the intended wife may be entirely satisfied with the provision made for her, and, if she then voluntarily enters into the contract she is bound by its terms.

*Id.* at 745–46.

*Baker* also held that the burden, in the sense of going forward with the evidence, was upon the prospective husband to show a full disclosure of the nature, extent and value of his property or that the prospective wife otherwise had full knowledge thereof.

In *Baker*, wife was 60 years old at the time of the marriage and had five grown children. Husband was also 60 years old and had four grown children. They became engaged in September 1933 and were married on 20 December 1933. On 14 December 1933, Baker presented his prospective bride with an antenuptial agreement and asked her to sign it. He represented to her that he was not a wealthy man but that they would not have to be dependent upon anyone else and he intended to leave her a $25,000 life insurance policy. She testified that the only knowledge she had of his assets and worth on the date she signed the agreement was that he owned a house at 1519 Harbert Avenue in Memphis and that he was interested in Trenton Cotton Seed Oil Company. At the time of the agreement Mr. Baker was worth between $200,000 to $250,000 and carried $61,500 of life insurance. At the conclusion of the evidence presented in a jury trial in the chancery court, the chancellor withdrew the issues from the jury and dismissed the wife's bill seeking to set aside the antenuptial agreement.

On appeal she raised a number of issues other than the disclosure issue and the Court of Appeals held that the chancellor had committed reversible error on several of those issues. In remanding the case for a new trial the court said:

> Whether the incidental relief prayed for by the bill will be granted depends on how these issues are answered upon another trial which is ordered. It is proper to say that we do not wish to be understood as intimating any opinion as to what the decision on these questions should be.

142 S.W.2d at 750. The *Baker* court concluded that the evidence on the issue of whether the antenuptial agreement was void for failure of the intended husband to make a proper disclosure of his financial condition was an issue of fact that should have been submitted to the jury.

*Sanders v. Sanders*, 40 Tenn.App. 20, 288 S.W.2d 473 (1955) involved the validity of an antenuptial agreement, but disclosure was not an issue.

In *Lightman v. Magid*, 54 Tenn.App. 701, 394 S.W.2d 151 (1965), the issue as stated in the Court of Appeals' opinion was "whether the contract [antenuptial agreement] should not be set aside because there was no detailed, sufficient disclosure of Lightman's assets prior to its making and because of fraud and undue influence in its execution." *Id.*, 394 S.W.2d at 154–55. Lightman was a widower, 71 years of age, and lived in Nashville. His future wife, then Mrs. Goldfarb, lived in Phoenix, Arizona, was a widow 58 years of age and an experienced business woman. They became acquainted through mutual friends and the antenuptial agreement was entered into prior to their engagement and marriage. Lightman mailed the antenuptial agreement to her in Phoenix, Arizona, and she had it in her possession for several days prior to signing it. She testified that he called her and told her the contract would protect her against his children, who would try by any means to trick her out of her interest in his estate. She further testified that she loved Lightman and hardly read the contract before signing it because it was unimportant to her.

The antenuptial contract provided that in return for complete relinquishment of her marital rights in his estate if he predeceased her, she would receive $40,000 or $400 per month for life and in case of divorce she would receive $25,000 as alimony. The preamble to the agreement contained the statement that Mr. Lightman was a "man of wealth". It was undisputed that Lightman did not furnish Mrs. Goldfarb with a list of his assets nor make any disclosure thereof, other than the statement in the contract that he was wealthy. At trial and on appeal it was her contention that the burden was on Lightman's executors to prove that he made a full disclosure and having failed to do so the contract was void.

The Court of Appeals held that no confidential relationship existed under the particular facts of that case and rejected her contention that the contract was void with the following factual analysis:

> She had the contract in her possession in Phoenix, Arizona, away from Lightman who was in Nashville, for several days. Phoenix was and had been her home for sometime, and she had friends there with whom she could counsel and advise about signing the contract. Prior to signing it she took it to a notary public who was also a lawyer and left it there for at least two days, possibly longer. She was advised by the first statement in the contract that Lightman was a man of wealth and in view of her experience both by reason of previous marriage and by reason of her business experience, she was put on notice by this provision and by the express, clear, limiting provisions that followed that the purpose of the contract was not to vest her with any interest in any property and so "to make her safe from Lightman's children,", but was for the purpose of limiting the interest she would acquire in Lightman's estate by marrying him. A perfectly reasonable and to be expected arrangement in view of their respective ages, seventy-one and fifty-eight, and the extreme unlikelihood that there would be any children of their union, and in view of the fact that Lightman had grandchildren to whom he wished to leave the bulk of his estate.

*Id.* 394 S.W.2d at 155–56. In addition to those factors, it is clear from a careful reading of the opinion that both the trial judge and the Court of Appeals had serious doubts about the credibility of Mrs. Lightman.

The instant case is obviously significantly different from *Lightman*. There is no question but that a confidential relationship existed between Fred Kahn and Susan Beam when they executed the antenuptial agreement. But she had specific knowledge of the extent of his wealth and makes no claim that she was misinformed.

With respect to legal principles, the *Lightman* court observed that our cases were in line with those in other states where there appeared to be more or less universal agreement. The principles of law stated therein are in harmony with those in *Baker*.

*Uhrig v. Pulliam,* 713 S.W.2d 649 (Tenn. 1986) involved the interpretation of an antenuptial agreement, but disclosure of assets was not an issue. Therein, this Court noted the enactment by the General Assembly of Public Acts 1980, chapter 492, codified as T.C.A. § 36–3–501, but other than observing that prior to that statute *Duncan v. Duncan,* 652 S.W.2d 913 (Tenn.App. 1983) had held that antenuptial agreements attempting to limit liability for future alimony were not enforceable, the effect of the statute upon the case law of Tennessee was not relevant to the issues and was not discussed.

■ The rule rendering unenforceable a limitation on the amount of alimony in antenuptial agreements was adopted in *Crouch v. Crouch,* 53 Tenn.App. 594, 385 S.W.2d 288 (1964). Judge Chattin, later a member of this Court, writing for the Court of Appeals, Middle Section, held that such provisions tend to promote divorce by inducing a mercenary husband "to inflict on his wife any wrong he might desire with the knowledge his pecuniary liability would be limited." *Id.,* 385 S.W.2d at 293. Thus, such provisions were held to be void as against public policy.

The Court of Appeals so held in this case and correctly observed that the invalidity of a provision limiting alimony does not invalidate the remainder of the antenuptial agreement.

■ No reported case in Tennessee has addressed a disclosure issue in an antenuptial agreement since the enactment of Public Acts 1980, chapter 492, T.C.A. § 36–3–501. That statute provides as follows:

> **Enforcement of antenuptial agreements.**—Notwithstanding any other provision of law to the contrary except as provided in § 36–3–502, any antenuptial or prenuptial agreement entered into by spouses concerning property owned by either spouse before the marriage which is the subject of such agreement shall be binding upon any court having jurisdiction over such spouses and/or such agreement if such agreement is determined in the discretion of such court that

> it was entered into by such spouses freely, knowledgeably and in good faith and without exertion of duress or undue influence upon either spouse. The terms of such agreement shall be enforceable by all remedies available for enforcement of contract terms.

A comparison of the requirements of the statute and the *Baker* rule reveals that the statute makes no reference to the requirement in *Baker* that where the provision for wife in an antenuptial agreement is wholly disproportionate to the husband's wealth, a full disclosure of the nature, extent and value of husband's property is required to sustain the validity of the agreement. Of course, numerous factual scenarios could occur in which the failure to make a full disclosure of assets, liabilities and values would breach the statutory requirement that the contract was entered into freely, knowledgeably and in good faith. However, in this case it is not necessary that we resolve the apparent conflict between the *Baker* rule and the statute because we find that the antenuptial agreement between these parties fully complies with the tests imposed in either of those rules.

The trial court made no explicit findings of fact with respect to whether husband had made a sufficient disclosure of his wealth, but it is implicit in the award made to the wife that he found the agreement valid, except for the unenforceable limitation on alimony, in accord with *Crouch* and *Duncan.*

The only findings of fact made by the Court of Appeals were that (1) neither husband nor his lawyer described the nature of his assets or the extent of his wealth at that time; (2) that they did not tell her of the legal and pecuniary rights she was surrendering, or that she could seek the advice of independent counsel before she signed the agreement.

Thus, there was no concurrent finding by the two courts below and our scope of review of the facts is *de novo* upon the record of the trial court accompanied by a presumption of correctness of its finding

unless the preponderance of the evidence is otherwise. T.R.A.P. 13(d).

We find that at the time wife executed the antenuptial agreement she had been informed by husband, or otherwise knew, that he owned 100% of the stock in Fred S. Kahn Company; that Fred S. Kahn Company owned and operated four hosiery manufacturing plants and that the corporation had a value of between seven and nine million dollars; that husband's personal activities on behalf of the company accounted for about 80% of its sales; that husband's annual gross income was approximately $360,000 and was derived from his salary and commissions paid to him by Fred S. Kahn Company and from some business real estate that he leased to Fred S. Kahn Company; and that he owned the Harding House condominium where they lived most of the time during their relationship and where she lived at the time of trial.

We find that there is not a scintilla of evidence in this record that husband owned a single asset of any value not described above or that husband underestimated or overstated the value of any asset or the amount or source of his income.

While the record reveals that the specific information about husband's assets described above was revealed to wife between April and July 1981, there is undisputed affirmative evidence that there was no significant change in the value of husband's principal asset, the Fred S. Kahn Company, or in his annual income between July 1981 and December 1982.

Wife admitted that she signed the antenuptial agreement freely and voluntarily and knowledgeably, without any duress or threat. At no time did she testify that she was ignorant of what a wife might expect to receive from a husband worth seven to nine million dollars, in the event of death or divorce, nor did she testify that she was deprived of the opportunity to seek independent counsel or, that in retrospect, she should have sought independent counsel.

Wife's brief in this Court impliedly contends that *Spurlock v. Brown, supra,* supports a rule requiring a husband to either prove that wife was given full and accurate legal advice with respect to the pecuniary benefits she may be giving up, or to insist that she seek and obtain independent legal advice. As we read *Spurlock,* the court first found that the prospective bride was factually misled about the wealth of the husband and that believing him, she was induced to execute the agreement. We do not regard the additional factor mentioned, to-wit: that she was not told that by virtue of the marriage her net worth of $3,700 would become his property, as authority for the proposition asserted by wife in the case before us. We hold that whether or not a wife should be explicitly advised about what she is giving up or should be urged and given full opportunity to seek independent counsel is a factual issue, in that it may be required in some circumstances and not in others. In this case, wife has made no claim that she needed or wanted any advice about what she was giving up, and we reject the contention that, as a matter of law, husband had the burden of showing that she was fully advised in order to sustain the validity of the agreement. Since *Crouch* invalidated limitations on alimony, the necessity that a prospective bride be instructed explicitly on what she is giving up in the event of divorce has been substantially diminished.

A detailed financial and operating statement of the Fred S. Kahn Company and a listing of the assets, liabilities and net worth of Fred S. Kahn individually, accompanied by certified appraisals of the various assets, would not have provided any financial information to Susan Beam that she did not then know that would have had any significant impact upon her decision to accept or reject the antenuptial agreement.

We find the following statement by the court in *Spurlock* of particular relevance here:

> In our opinion there is no sound reason why she may not, if of age and acting freely and understandingly, agree, in consideration of the marriage alone, to give up the pecuniary benefits that would come from it. The value of the marriage can be estimated by no one as well as herself; and if it be accepted by

her freely, as an equivalent for monetary sacrifices, the courts should not interfere after she has obtained the marriage she contracted for, no matter how great such sacrifices may be, provided she was not misled.

*Id.,* 91 Tenn. at 257–58.

Wife was not misled in this case and we are confident in observing that if husband had made the disclosure described above on or immediately prior to 16 December 1982 and his net worth and that of his corporation had varied up or down a few million dollars the same agreement that we have before us would have been executed.

We find the antenuptial agreement valid because wife had full knowledge of the nature, extent and value of the intended husband's property at the time she executed the agreement, making full disclosure at that time unnecessary. That circumstance and the fact that she was never mislead and that she knowingly and voluntarily executed the agreement fully satisfy the *Baker* test and the statutory requirements.

### III.

Wife contends that this Court should award a substantial fee for the services of her attorney, or remand to the trial court for proof as to the amount of a reasonable fee.

As stated heretofore, the Court of Appeals vacated the fee award by the trial court. Specifically, that court said as follows:

> [t]he amount of an attorney's fee award must be based upon a fully developed record of the nature of the services rendered and an analysis of the proof using the factors delineated in Tenn.S.Ct.R. 8, D.R. 2–106(B). *Connors v. Connors,* 594 S.W.2d 672, 676–77 (Tenn.1980). The absence of proof concerning the nature of the legal services provided requires the reversal of a fee award.

■ *Connors* does not say that a fully developed record of the nature of the services rendered is a prerequisite to an award of an attorney's fee in a divorce case. The parties in that case settled all property issues except the amount of wife's fee to be paid by husband which they expressly reserved for litigation. In those circumstances, and for that reason, there was a fully developed record in *Connors.* However, there is nothing in the opinion by this Court, expressly or by implication, mandating proof on that issue to support and award made by a trial judge.

In *Wilson Management v. Star Distributors,* 745 S.W.2d 870 (Tenn.1988), we said:

> Again, we agree with *Trice* [*v. Hewgley,* 53 Tenn.App. 259, 381 S.W.2d 589 (1964)] that a trial judge may fix the fees of lawyers in causes pending or which have been determined by the court, with or without expert testimony of lawyers and with or without a prima facie showing by plaintiffs of what a reasonable fee would be. Obviously, the burden of proof on the question of what is a reasonable fee in any case is upon the plaintiff and plaintiff should be in a position to tender such proof. However, if a trial judge is prepared to fix a reasonable fee based upon the appropriate guidelines without first hearing plaintiff's proof, defendant must be accorded full opportunity to cross examine plaintiff's witness and present evidence on that issue.

*Id.* at 873.

The above quote from *Wilson Management* involving a contract provision calling for a reasonable attorney's fee is applicable to a divorce case.

No proof was presented with respect to the value of the services rendered wife in the instant case. During oral argument in the trial court, when wife's lawyer urged the court to award a reasonable attorney's fee the judge asked him to name an amount and his response was $20,000. During husband's lawyer's argument, which followed, no mention was made of the fee issue. At no time in the trial court, nor in this Court, has husband insisted that wife adduce proof on this issue.

Obviously, the trial judge felt that the *pendente lite* proceedings which had been heard by him, the pre-trial briefs, depositions and the three day trial had sufficient-

ly acquainted him with the factors we delineated in *Connors* to make a proper award of an attorney's fee without proof or opinions of other lawyers. When the trial judge did so, it was incumbent upon husband's lawyer to request a hearing if dissatisfied with the award, or convince the appellate courts that he was denied the opportunity to do so through no fault of his own.

We have before us the full record of the trial court proceedings, the briefs in the Court of Appeals and this Court and we have heard oral argument, from all of which we can weigh the *Connors* factors and determine the nature and value of the services rendered on behalf of wife. We find that a reasonable and proper fee to be paid by husband to wife's lawyer in the circumstances of this case is $25,000.

The judgment of the Court of Appeals is reversed. The decree of the trial court is modified by directing that upon remand the trial court enter a decree vesting fee simple title to the Harding House condominium in wife and directing that husband pay the mortgage indebtedness and remove the lien on that property and by increasing the attorney's fee award to $25,000. In all other respects, the judgment of the trial court is affirmed. This cause is remanded to the trial court for the entry and enforcement of a decree in accord with this opinion.

Costs are adjudged against defendant.

HARBISON, C.J., and COOPER, DROWOTA, O'BRIEN, JJ., concur.