IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June, 2000 Session


**KAREN GARRETT HUMPHRIES v. DAVID ALISON HUMPHRIES**

**Appeal from the Chancery Court for Washington County**
**No. 32330    Hon. Jean A. Stanley, Chancellor**


**FILED JULY 18, 2000**

**No. E1999-02694-R3-CV**


Both parties appeal the Trial Court's Judgment in this divorce case. Wife appeals the Trial Court's enforcement of a prenuptial agreement. Husband appeals the Trial Court's division of the marital assets and the amount and duration of rehabilitative alimony awarded to Wife. For the reasons herein stated, we find the Trial Court erred in enforcing the prenuptial agreement. We reverse and vacate the decision of the Trial Court and remand the case to that Court for further proceedings consistent with our Opinion.


**Tenn. R. App. P. 3; Judgment of the Chancery Court**
**Reversed and Vacated; Case Remanded.**


D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and HERSCHEL P. FRANKS, J., joined.

David S. Haynes, Bristol, for the Defendant/Appellant, David Alison Humphries.

Robert D. Arnold, Johnson City, for the Plaintiff/Appellee/Counter-Appellant, Karen Garrett Humphries.


**OPINION**

**Background**

Karen Garrett Humphries ("Wife") and David Alison Humphries ("Husband") were

married on October 22, 1994.  There are no children born to this marriage.  Each of the parties was married previously and each has children of the previous marriages.  Wife's children, who reside with her, are 13 and 15 years of age.  Husband's children, who do not reside with him, are adults. When the parties married, Wife was a self-employed, part-time interior design consultant, earning nine or ten thousand dollars a year.  She testified that she was physically able to work full-time but she does not do so because "I have kids and I have to – once school's out they run my life."  When the parties married, Husband was also self-employed as one-half owner of Smoky Mountain Freightliners, Smoky Mountain Properties and Smoky Mountain Leasing, three businesses involved in sales and leasing of tractor trailer rigs.  He also owned a quadriplex condominium building from which he received regular rental income.

In anticipation of marriage, Husband asked Mr. Jack Bonner, his C.P.A., to meet with him and Wife.  Bonner testified that he has been  a C.P.A. for the Smoky Mountain Freightliner businesses since the companies' inception.  In 1994, when Husband and Wife married, the companies were "just barely making it . . . it was really a guesstimation as to - - as to [whether] the entity was going to survive or not.  It could have easily failed or it could have easily succeeded." However, when the business moved from Bristol to the intersection of Interstates 81 and 181 in Johnson City, "it greatly increased the value of the business because sales got bigger, they had more parts and service income and they have more visibility from the highway."

Bonner testified that Husband called him on October 3, 1994 and asked him to meet with him and Wife about a prenuptial agreement.  Bonner called Mr. Don Cooper, an attorney and C.P.A. who had also been involved with the businesses, and asked him to fax "a blank copy or a draft copy of a prenup so I can go over one with them."  Bonner testified that he received the faxed document from Cooper and drove to Husband's office that day and met with Husband and Wife. Wife denied at trial that this meeting occurred.  Husband did not recall the meeting.  Bonner testified that he explained to Wife that "we wanted to get a prenupt before they got married . . . ."  Bonner testified that Wife joked about it and then replied, "I don't care anything about his money, all I do care about is him and that doesn't matter," and started laughing.  Bonner said he remembered the meeting clearly because "it was a very monumental moment for me because he had given a prenupt to another person upon my advice . . . six to eight months earlier, and she had actually walked away from being engaged to him and they ended up not getting married."  He testified that during the meeting, he

> . . . went through what a prenupt was and I basically, I told her that this secured her assets, secured his assets, if he died his children would get all of his assets; if she died her children would get all of her assets.  If they got divorced, then the assets would be split the same way, he would get his, she would get hers.

Bonner testified that he went through the sample document with them, and he thinks the prenuptial agreement that the parties ultimately signed was "almost exactly like [the one they went over].  In fact, I think all that Cooper did was put the names in."  Bonner told them "to go see Cooper" because he, Bonner, was not an attorney and didn't practice law.  Bonner did not ask the parties about their

separate assets or discuss the values of those assets during the meeting. He was at the business on October 21, 1994 and witnessed the parties' signing the document. There was no discussion of the values of the parties' assets at the meeting when the document was signed, and there were no financial statements attached to the document. At trial, the following inquiry to Bonner from the Court occurred:

> THE COURT: First – the first page says, "Each of the parties has made a full disclosure." Did you all talk about that?
>
> A: No ma'am, we went straight to the – what the agreement was, based on what I can remember, that we talked about what a prenupt was basically and basically what an agreement would look like.
>
> THE COURT: You pretty much skipped the first page then?
>
> A: Yes ma'am. I left that to the attorney.
>
> THE COURT: Did you go over the third page?
>
> A: No, most of mine was dealt with what a prenupt was and what was on the second page.

The parties met with Cooper on October 10, 1994. The meeting was scheduled by Bonner. Wife testified that she thought the only purpose of the meeting was to prepare wills and that a prenuptial agreement was not mentioned at the meeting. Husband testified that he had discussed the prenuptial agreement with Wife previously and that both he and Wife knew the purpose of the meeting was to prepare wills and a prenuptial agreement. Cooper testified that he had never met Wife before October 10, 1994 and never saw her after that until this case came to trial. He testified that he did not advise Wife that he represented Husband in the matter and did not recall whether he advised her that she should consider seeking independent legal advice, but that "I would have in the usual course of events." He testified that "[w]hen they walked in I wasn't representing either of them and I did – of the two I would have considered Mr. Humphries my client." At the October 10th meeting, Cooper obtained some basic information from Husband and Wife to use in preparing wills and a trust for Wife's minor children in the event of her death. He also asked the parties to prepare current financial statements, which he needed to prepare a prenuptial agreement. He did not recall discussing with the parties why he needed the financial statements. However, he thinks Wife understood that he was going to draft an antenuptial agreement.[1] The parties and the Trial Court used both terms, "antenuptial" and "prenuptial", throughout the trial. During the meeting, Cooper

_____

[1] THE COURT: Alright, do I understand then that you're telling me that you do recall and can tell me positively that you think Ms. McKinnon understood that this was an antenupt agreement? A: Yes, that's what we discussed that day.

had an outdated financial statement from Husband on his desk, which he did not discuss with the parties and did not consider to be acceptable because of its date. Cooper asked Husband to prepare an updated statement. He opened a "will file" in his office, in which he placed his notes of the meeting.[2] Those notes do not mention "divorce," "alimony," "prenup" or "antenuptial."

After the meeting with Cooper, Wife prepared the requested financial statement on October 11, 1994. Husband also prepared an updated financial statement and dated it October 14, 1994. Cooper testified that on October 13, 1994, Husband delivered the parties' financial statements to his office, and he placed them in his office "will file," where they remained until this litigation arose. When asked whether he ever drafted a will for either of the parties, Cooper testified "I went back and looked. I could not find one." He also stated that he has no recollection of giving Wife a copy of Husband's financial statement, and that he "would have had no reason to" discuss asset values with her. He testified that he did not draft an agreement when Husband and Wife were in his office on October 10, 1994. He thinks he prepared the first draft of an agreement on October 16th or 17th and revised it on October 20th, after he got a phone call from Husband "asking what I had done. He also told me they were going -- they wanted to sign it." At Husband's request, Cooper faxed the second draft to him. Cooper did not intend this October 20th document to be a final version. He testified that " . . . clearly a draft document was sent to Mr. Humphries for comment and – 'cause I had no way to contact Ms. McKinnon (Wife)." He thought the parties were planning to execute the document the next day "with any modifications that they wanted." The draft document that he faxed to Husband contained the statement: "Attached to this agreement is a copy of the most current financial statement of each of the parties." However, Cooper did not fax those attachments. When asked why not, he replied:

> Because it wasn't sent as a document, it was – my – again, for
> business practice I would have sent it to a – would have sent it to a
> client, the clients would have reviewed it. It would have been signed
> in my office in multiple copies with documents attached.

Cooper testified that he was not involved with the execution of the document by the parties. He received the executed agreement, postmarked October 21, 1994, in the mail at his office on October 24, 1994. The document he received did not have any financial statements attached. He filed the document in the "will file" where the financial statements were filed.

Wife testified that she and Husband discussed "some type of agreement" before they were married because they were planning to honeymoon in the Bahamas "and he presented it to me as though, since we were both taking a plane trip that we should protect our children in case something ever happened to us while we were gone." She testified that Husband never mentioned prenuptial or antenuptial or what would happen if there were a divorce. Husband told her to "prepare a list of protected assets," which she did, and then he took her to Don Cooper's office. She never

---

[2]He testified that he placed the documents in a "will file" because such a file has the longest retention period of all the files he stores in his office.

saw any financial statements or papers that Husband may have prepared. She never saw any financial statement of Husband's until six weeks before trial, and when she saw it then, "I was amazed by this material. I had no idea. . . . I had no idea that he was -- his total assets were $575,000 when I married him . . . I knew he had a house. I knew he owned the apartments and I knew he had a business." When asked whether she knew the value of these properties, she replied, "I don't know how you can look at a building and determine what a business is worth." Husband never told her anything before the marriage about the value of his business, the total sales, the overhead costs, or his indebtedness. However, on cross-examination, she answered "No," when asked, "Have you learned anything that now surprises you about the business . . . the apartments' value . . . the house also?" Wife was at Husband's business office with him, his secretary and Andy Bonner when she signed the agreement on October 21, 1994. There were no financial statements attached to the document, and there was no discussion about the contents of the document when it was signed. She testified that, when the divorce was first set for trial:

> I had an argument with Andy Bonner . . . about whether or not there was an antenuptial agreement . . . we had a big argument on the phone about it 'cause I - - I didn't recall this - - I didn't look at this as an antenuptial agreement. This was protection for the children in the case of our death.

On cross-examination, she testified that she has four years of college education. When asked to read the prenuptial agreement during trial, Wife stated, "I understand every word."

Husband testified that he dated Wife for a couple of years before they married. When asked about Wife's premarital knowledge about his assets, he testified:

> She visited my house on a regular basis. She visited the apartments from time to time with me and she's come by the truck dealership to go to lunch or something like that every now and then.

He testified that she probably did not know the amount of rent he collected from his apartments until "about the time we got married." He didn't recall whether she had ever visited the new property on I-81 at I-181 before the marriage. Before the marriage, Husband's business was barely solvent, and the move to I-81 at 181 (after the marriage) "made a difference overnight". He stated that he and Wife first discussed a prenuptial agreement while on a five-hour drive from her condominium at Hilton Head about six months before they married. He thought she was very positive about the idea then. He was uncertain about whether he and Wife met with Bonner before the agreement was signed:

> My recollection was, that the discussion with Andy took place basically the same day that we signed this agreement. That has since turned out to be a wrong recollection, but that was my recollection of it originally and for that matter still is. But Bonner and I discussed, he discussed with Karen things about a prenup . . . I don't recall

specifics.

Although Husband has very little recall about specific events prior to the parties' signing the agreement, he did testify that "I'm sure we discussed it with each other with it in front of us . . . before the signing of it." However, he later testified that she could not have reviewed the document with him before it was signed because she did not have it. He did not recall whether or not he helped Wife prepare her financial statement which Cooper had requested. When asked what he recalled about the preparation of the financial statements, he replied, "I don't recall much at all." He never gave Wife a copy of his financial statement and never got a copy of hers. He doesn't know what was in her financial statement and he "can't say for certain" that she knew what was in his financial statement. His understanding of the agreement that was to be signed was that "anything we do after the marriage would be together, but prior to the marriage what we had was being separated." He does not consider the appreciation in value of his business after the marriage to belong to the parties together, but he did not discuss that with Wife. He and Wife never had any discussion specifically about valuations or asset values. He recalls that when the prenuptial agreement was signed, the meeting was very brief, "Karen made a joke and jumped up and said, 'I'm not marrying this man for his money' and made a joke out of it."

As stated, the parties signed the agreement on October 21, 1994 and were married the following day. They lived together for three years, were separated on February 1, 1998, and were granted this divorce on November 24, 1999. Husband testified that, despite his purported desire to keep the parties' pre-marital assets separate, numerous transactions occurred during the first year of the marriage in which Wife invested her separate assets in jointly held property. For instance, she received $126,000 from the sale of her home and invested $32,000 of that cash to pay off the mortgage on Husband's rental condominiums. She also took care of the condominiums and more or less managed them after the marriage. Despite that investment, Husband did not give Wife a note for the investment or put her name on the deed to the condominiums. Husband and Wife bought a lot to build a house for $30,000 with Wife's cash, and the lot was deeded in the name of both parties. Wife invested $48,000 of her own cash in the construction of the parties' new home, which the parties owned together. She testified that she also paid the parties' household expenses out of her child support payments during the first year of the marriage, when Husband lived at her home.

After the marriage, Husband's business moved from Bristol to Johnson City. Wife assisted with or did most of the interior design of the new facility. Expert testimony indicated that the appraised value of Husband's ownership interest in Smoky Mountain Freightliner as of December 31, 1994, soon after the parties married, and before the move, was $121,000. The business grew phenomenally after the move, during the marriage. The business had ordinary income in 1998 of $1.16 million on gross receipts or sales in excess of $26 million. Husband's 1998

adjusted gross income as shown on his income tax form for that year was $755,637.[3]  The appraised value of Husband's 50 percent ownership interest in his company as of April 15, 1999 was $1.44 million.  The real estate on which the business is located had an additional appraised value at the time of the divorce of $2 million with a mortgage of $1.3 million.

The Trial Court upheld the validity of the prenuptial agreement.  In doing so, the Court reasoned:

> Ms. Humphries testified in her deposition that she has not subsequently learned anything of surprise to her about Mr. Humphries' assets or the value of those assets as they existed at the time of the marriage.  It appears to the Court that while the parties did not receive copies of each other financial statement, they were well aware of the assets each owned and the approximate value thereof.

The Trial Court then divided the parties' marital property and awarded Wife rehabilitative alimony of $800 per month for four years.

### Discussion

Both parties appeal the Trial Court's decision.  Wife argues that the evidence preponderates against the finding by the Trial Court that the prenuptial agreement was valid. Husband maintains that the Trial Court improperly awarded Wife $235,800 in marital assets while awarding Husband marital debt in excess of the marital assets he was awarded, resulting in a negative net award to Husband of -$148,500.  Husband also raises the issue that the Trial Court's award of rehabilitative alimony to Wife was improper because of the short duration of the marriage and Wife's increase in income and net worth during the marriage.

Our review is *de novo* upon the record, accompanied by a presumption of the correctness of the findings of fact of the Trial Court, unless the preponderance of the evidence is otherwise.  Rule 13(d), T.R.A.P.; *Davis v. Inman,* 974 S.W.2d 689, 692 (Tenn. 1998).  The Trial Court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *Ganzevoort v. Russell,* 949 S.W.2d 293 (Tenn. 1997).

Prenuptial agreements are statutorily favored in Tennessee:

> **Antenuptial or prenuptial agreements.** Notwithstanding any other provision of the law to the contrary, except as provided in § 36-3-502, any antenuptial or prenuptial agreement entered into by spouses

---

[3]He explained that he did not have use of all of that "income," because it was "pass through income," "paid" to him personally and income tax paid by him personally, but retained by his company in order to increase its capital and "grow" the company.

concerning property owned by either spouse before the marriage which is the subject of such agreement shall be binding upon any court having jurisdiction over such spouses and/or such agreement if such agreement is determined, in the discretion of such court, to have been entered into by such spouses freely, knowledgeably and in good faith and without exertion of duress or undue influence upon either spouse. The terms of such agreement shall be enforceable by all remedies available for enforcement of contract terms.

T.C.A. § 36-3-501 (1991). Prenuptial contracts are also favored by public policy in Tennessee. *Perkinson v. Perkinson,* 802 S.W.2d 600, 601 (Tenn. 1990); *Hoyt v. Hoyt,* 372 S.W.2d 300, 303 (Tenn. 1963); *Key v. Collins,* 236 S.W. 3, 4 (Tenn. 1921). Prenuptial contracts benefit the parties by defining their marital rights in property which tends to be among the most frequent causes of family discord. *Sanders v. Sanders,* 288 S.W.2d 473, 477 (Tenn. Ct. App. 1955). They also enhance the opportunities for middle-aged persons to re-marry by protecting their separate assets for the children of previous marriages. *Wilson v. Moore,* 929 S.W.2d 367, 370 (Tenn. Ct. App. 1996). An engagement to marry establishes a confidential relationship between the parties. *Baker v. Baker,* 142 S.W.2d 737, 745 (Tenn. Ct. App. 1940). Accordingly, engaged persons who plan to execute a prenuptial agreement must make "a full disclosure of the nature, extent and value" of their property in order to enable their prospective spouse to make a knowledgeable decision about entering into the agreement. *Williams v. Williams,* 868 S.W.2d 616, 619 (Tenn. Ct. App. 1992). The required disclosure may be accomplished through a formal, explicit process, such as exchanging lists of holdings, or it can be made more informally over the course of the relationship. *Kahn v. Kahn,* 756 S.W.2d 685, 695 (Tenn. 1988).

Our Supreme Court addressed the validity of an antenuptial agreement in *Kahn v. Kahn,* 756 S.W.2d 685 (Tenn. 1988). In that case, the husband had told the prospective wife, eighteen months before the signing of the agreement, "that he had four plants and was worth millions;" that he "was worth approximately 8 to 9 million dollars;" and "that he was making around $360,000 a year from all of his investments." The Trial Court upheld the agreement but the Court of Appeals declared the agreement to be void for the husband's failure to make full disclosure of his wealth immediately prior to the execution of the agreement. The Supreme Court discussed what it called "the *Baker* rule:"

> No reported case in Tennessee has addressed a disclosure issue in an antenuptial agreement since the enactment of Public Acts 1980, chapter 492, T.C.A. Sec. 36-3-501. [Statute quoted.] A comparison of the requirements of the statute and the *Baker* rule reveals that the statute makes no reference to the requirement in *Baker* that where the provision for wife in an antenuptial agreement is wholly disproportionate to the husband's wealth, a full disclosure of the nature, extent and value of husband's property is required to sustain the validity of the agreement. Of course, numerous factual scenarios could occur in which the failure to make a full disclosure of assets,

-8-

liabilities and values would breach the statutory requirement that the contract was entered into freely, knowledgeably and in good faith. However, in this case, it is not necessary that we resolve the apparent conflict between the *Baker* rule and the statute because we find that the antenuptial agreement between these parties fully complies with the tests imposed in either of those rules.

The Court then reversed the Court of Appeals' decision in *Kahn* and held the agreement valid, finding "that there is not a scintilla of evidence in this record that husband owned a single asset of any value not described above or that husband underestimated or overstated the value of any asset or the amount or source of his income." The Supreme Court opined:

[a] detailed financial and operating statement of the Fred S. Kahn Company and a listing of the assets, liabilities and net worth of Fred S. Kahn individually, accompanied by certified appraisals of the various assets, would not have provided any financial information to Susan Beam that she did not then know that would have had any significant impact upon her decision to accept or reject the antenuptial agreement.

\* \* \*

We find the antenuptial agreement valid because wife had full knowledge of the nature, extent and value of the intended husband's property at the time she executed the agreement, making full disclosure at that time unnecessary. That circumstance and the fact that she was never misled and that she knowingly and voluntarily executed the agreement fully satisfy the *Baker* test and the statutory requirements.

*Kahn v. Kahn,* 756 S.W.2d 685, 695 (Tenn. 1988).

This Court applied the reasoning of *Kahn* in *Williams v. Williams,* 868 S.W.2d 616 (Tenn. Ct. App. 1992). In that case, the wife sought to dissent from her deceased husband's will and take an elective share as his surviving spouse. Husband's son presented his father's antenuptial agreement in opposition to wife's petition. The Chancery Court found in favor of the son and the Court of Appeals reversed, finding that husband had not disclosed the full extent of his estate prior to executing the antenuptial agreement, and thus the agreement was ineffective. The Court opined:

The 1980 statute does not specifically recognize the rule that full disclosure of the nature, extent and value of the property [of the] spouse's estate is required when the contract provides for a disproportionate distribution of that estate.

-9-

* * *

> The *Kahn* court's interpretation of the statute as requiring full disclosure where one spouse is to receive a disproportionate share of the other spouse's estate under the agreement is in accord with the weight of authority in other states which have considered the validity of ante-nuptial agreements. Most of these courts reason that disclosures are required in this situation because the parties to ante-nuptial agreements do not deal with each other at arms length as do the parties to an ordinary commercial transaction. Instead, the intent to marry gives rise to a confidential relationship that imposes on each the duty to make a full and fair disclosure of the nature, extent and value of the property that he or she presently holds, so that the other party may make an intelligent decision as to what would be gained or lost by entering into the agreement.

*Williams v. Williams,* 868 S.W.2d 616, 619 (Tenn. Ct. App. 1992)

Our Supreme Court clarified the statutory standard by which the validity of antenuptial agreements should be judged in *Randolph v. Randolph,* 937 S.W.2d 815 (Tenn. 1996). In that case, the Trial Court invalidated an antenuptial agreement, finding that the wife did not "knowledgeably" sign the agreement, as required by statute. The Court of Appeals, in a split decision, reversed, finding the totality of the circumstances established that the wife possessed sufficient knowledge of the husband's business affairs and financial status at the time she signed the agreement to meet the statutory requirement of "knowledgeably" executing the agreement and that the agreement was therefore enforceable. The Supreme Court reversed, and explained:

> We interpret the statutory requirement that an antenuptial agreement is enforceable only if entered into "knowledgeably" to mean that the spouse seeking to enforce an antenuptial agreement must prove, by a preponderance of the evidence, either that a full and fair disclosure of the nature, extent and value of his or her holdings was provided to the spouse seeking to avoid the agreement, or that disclosure was unnecessary because the spouse seeking to avoid the agreement had independent knowledge of the full nature, extent, and value of the proponent spouse's holdings.

The Supreme Court applied that standard and found that, in *Randolph,* the wife did not "knowledgeably" sign the antenuptial agreement. In that case, the wife read the antenuptial agreement in the car while driving to her husband's lawyer's office to sign it the day before the wedding. She knew about some of her husband's property holdings but was not aware of, nor did anyone disclose to her, "the full extent and value of his assets and holdings." She was not represented by counsel when she signed the agreement, which was drafted by her husband's attorney. That attorney testified that it was his normal practice to explain such documents to both parties but he could not specifically recall following that practice in this case. He also testified that he did not

-10-

provide the wife with a copy of her husband's financial statement prior to execution of the agreement, nor did he discuss the specific dollar value of the husband's holdings with her, but instead only discussed her husband's assets in general terms.  The husband also testified that he never advised his wife of his net worth, but asserted that she was aware of the nature of his holdings, since they had lived together for more than one year before the agreement was signed, and she had accompanied him to many of his properties to collect rent.  The Trial Court found the agreement invalid for failure of the husband to prove that the wife signed it "knowledgeably."  The Court of Appeals reversed, finding that neither independent counsel nor a financial statement is absolutely necessary to satisfy the "knowledgeably" requirement of the statute.  The Supreme Court granted permission to appeal on the single issue of whether the agreement was entered into "knowledgeably."  The Court opined:

> Prior to the statute, at common law, the rule governing the disclosure required to validate antenuptial agreements was announced by the Court of Appeals in *Baker v. Baker,* 24 Tenn.App. 220, 142 S.W.2d 737 (1940).

> \* \* \*

> This Court first addressed the disclosure issue following adoption of Tenn. Code Ann. § 36-3-501 in *Kahn v. Kahn,* 756 S.W.2d 685 (Tenn. 1988).

> \* \* \*

> Initially, this case requires that we resolve the issue left open in *Kahn* - whether the statute abrogated the rule announced in *Baker* requiring proof of full disclosure or independent knowledge to validate an antenuptial agreement.  It is instructive to note that the rule announced in *Baker* remains the prevailing view throughout the country.  Moreover, unlike the court in *Kahn,* we do not perceive a conflict between the rule announced in *Baker* and the statute providing for enforcement of antenuptial agreements entered into "knowledgeably."  As we interpret the knowledge element of the statute, the spouse seeking to enforce an antenuptial agreement must prove, by a preponderance of the evidence, either that a full and fair disclosure of the nature, extent, and value of his or her holdings was provided to the spouse seeking to avoid the agreement, or that disclosure was unnecessary because the spouse seeking to avoid the agreement had independent knowledge of the full nature, extent, and value of the proponent spouse's holdings.  Under the statute, disclosure or full knowledge is required in all cases, not just those which involve an agreement in which the provision for one spouse is wholly disproportionate to the means of the other spouse.

-11-

*Randolph v. Randolph*, 937 S.W.2d 815, 821 (Tenn. 1996). The Supreme Court also described what is required to meet the burden of proving knowledge:

> As we view the statute, knowledge is simply an element that must be proven to establish the existence of a valid contract. Ordinarily, the burden of proving the existence of a valid contract is upon the person relying on the contract. In the context of antenuptial agreements, the same is true. The proponent has the burden of establishing the existence and terms of the agreement, as would be the situation in any other contractual setting.
>
> \* \* \*
>
> While disclosure need not reveal precisely every asset owned by an individual spouse, at a minimum, full and fair disclosure requires that each contracting party be given a clear idea of the nature, extent, and value of the other party's property and resources. Though not required, a fairly simple and effective method of proving disclosure is to attach a net worth schedule of assets, liabilities, and income to the agreement itself.
>
> In the absence of full and fair disclosure, an antenuptial agreement will still be enforced if the spouse seeking to avoid the agreement had independent knowledge of the full nature, extent, and value of the other spouse's property and holdings. Of course, the particular facts and circumstances of each case govern, to a great degree, the determination of knowledge. Some factors relevant to the assessment include, but are not limited to, the parties' respective sophistication and experience in business affairs, the duration of the relationship prior to the execution of the agreement, the time of the signing of the agreement in relation to the time of the wedding, and the parties' representation by, or opportunity to consult with, independent counsel.

*Randolph*, 937 S.W.2d at 822.

We have carefully reviewed the evidence in the record before us to determine whether it preponderates against the Trial Court's finding that "while the parties did not receive copies of each other financial statements, they were well aware of the assets each owned and the approximate value thereof." We find Wife was aware of Husband's assets. She testified that she knew he had a house, a business and a condominium building. She had visited each of these properties with Husband on a number of occasions before the marriage. However, the proof preponderates against the Trial Court's finding that Wife knew the value of Husband's assets.

-12-

Bonner, C.P.A. for Husband's businesses, testified that he met with the parties to inform Wife that Husband wanted a prenuptial agreement, but he did not ask them about their separate assets or discuss the values of those assets during the meeting. He was present on October 21, 1994 when the prenuptial agreement was signed, and there was no discussion of the values of the parties' assets at that time. There were no financial statements attached to the document. The Trial Court asked Bonner: "[t]he first page says, 'Each of the parties has made a full disclosure.' Did you all talk about that?" Bonner responded: "No ma'am..." Don Cooper, attorney for Husband's businesses, testified that, although he had Husband's outdated financial statement on his desk on the one occasion when he met with the parties, he did not discuss it with them, but rather asked them to prepare new financial statements and bring them back to his office. Husband later delivered financial statements to Cooper's office, and Cooper filed them in his file, where they remained until this matter came to litigation. He had no recollection of giving Wife a copy of Husband's financial statement, and testified that he would have had no reason to discuss asset values with her because their meeting was a preliminary one and he expected to see them again when the prenuptial agreement was to be signed. Although he faxed a second draft to Husband on October 20, 1994, and that document contained the phrase "[a]ttached to this agreement is a copy of the most current financial statement of each of the parties," he did not, in fact, fax any financial statements to Husband. He expected the parties to review the draft and come to his office to sign the document, where he would attach the financial statements. However, the draft document was returned to him by mail several days later, and it had been signed as the final agreement, without the financial statements attached.

Wife testified that she never saw Husband's financial statements until six weeks before this trial, and when she saw one then, "I was amazed by this material. I had no idea . . . I had no idea that he was -- his total assets were $575,000 when I married him . . . I knew he had a house. I knew he owned the apartments and I knew he had a business." She testified that Husband never told her anything before the marriage about the value of his business, the total sales, the overhead costs, or his indebtedness. Husband testified that he could not recall any meeting with Bonner before the agreement was signed. He does not recall much at all about the preparation of financial statements, but he does know that he never gave Wife a copy of his financial statement and never got a copy of hers. He "can't say for sure" that she knew what was in his financial statement. He and Wife never had any discussions specifically about valuation or asset values.

In summary, we find, by a preponderance of the evidence, that Husband, as the spouse seeking to enforce the prenuptial agreement, failed to prove either that a full and fair disclosure of the nature, extent, and value of his holdings was provided to Wife or that Wife had independent knowledge of the full nature, extent, and value of Husband's property and holdings. As was the case in *Randolph*, Wife did not "knowledgeably" sign the prenuptial agreement. Accordingly, we reverse the judgment of the Trial Court which upheld the prenuptial agreement. This reversal requires a reconsideration by the Trial Court of all related issues, including the division of marital assets and the award of alimony. Therefore, we vacate the judgment of the Trial Court in its entirety and remand the case to that Court for further proceedings consistent with this Opinion.

## **Conclusion**

The judgment of the Trial Court is reversed and vacated and this cause is remanded to the Trial Court for such further proceedings as may be required, consistent with this Opinion, and for collection of the costs below. The costs on appeal are assessed against David Alison Humphries.

_____
D. MICHAEL SWINEY, JUDGE