Lil Gordy UHRIG, Plaintiff/Appellee,

v.

June PULLIAM, Individually and as Administratrix of the Estate of Maurice Uhrig, and Roberta Swindle, Defendants/Appellants.

Supreme Court of Tennessee, at Nashville.

July 7, 1986.

Jerry D. Hunt, Vester Neal Agee, Sr., Lebanon, for plaintiff/appellee.

B.F. "Jack" Lowery, Lebanon, Solon Fitzpatrick, Carthage, for defendants/appellants.

## OPINION

HARBISON, Justice.

This action was brought by plaintiff, Lil Gordy Uhrig, as the surviving widow of Maurice Uhrig, deceased, seeking the enforcement of an antenuptial agreement between her and the decedent. In the alternative she sought to avoid the same and to assert her statutory rights as a surviving spouse. Named as defendants were the Administratrix of the estate and her sister, who were the beneficiaries under the probated last will of the decedent.[1] Both the Chancellor and the Court of Appeals sustained the antenuptial agreement against a general attack that it was void for reasons of public policy. There was no claim that it was the result of undue influence, duress, fraud or lack of mental capacity.

Both the Chancellor and the Court of Appeals construed the antenuptial agreement as not containing any binding contract on the part of Mr. Uhrig to make a will in favor of plaintiff. Both held that its terms were effective to waive the widow's elective share of the decedent's estate but that plaintiff was still entitled to claim her statutory rights of homestead, year's support and exempt property. We granted review to give further consideration to the issues.

There is little dispute concerning the material facts. Maurice Uhrig and plaintiff were married on April 21, 1977. Both parties had been previously married. Plaintiff had adult children by a previous marriage; Mr. Uhrig never had any children. He was approximately 61 years of age at the time of the marriage, and she had just passed her 53rd birthday.

Mrs. Uhrig owned a residence in Davidson County which appears to have been one of her principal assets. She also possessed household furnishings and personal property. The extent of the estate of Mr. Uhrig is not shown, but the parties moved into and lived in a home which he owned in Lebanon, Tennessee. It was also filled with household goods and furnishings. Documents in the record show that he was the holder of some life insurance policies, retirement benefits and stock options, on all of which he named Mrs. Uhrig as beneficiary on April 29, 1977. The record is unclear as to whether she remained the designated beneficiary on all of these programs at the time of his death on January 28, 1984.

The antenuptial agreement dated April 20, 1977, was prepared by an attorney. After reciting that the parties were contemplating marriage and that each owned individual assets acquired during previous marriages, it recited that plaintiff had children and that Mr. Uhrig did not. It then continued:

---

1. That will is not in the record, and we assume that Mrs. Pulliam is Administratrix c.t.a. rather than the named executrix. Because all parties have sought review here of the decisions of the courts below, we will use their designations as they appeared in the trial court.

"AND WHEREAS, it is the desire of each of us, and particularly of the said LIL GORDY, that no property owned by either of us shall pass to the other upon death, unless and until a will to that effect has been executed by us ..." the instrument was being executed for the purpose of implementing that agreement and understanding.

The Agreement contained nine numbered paragraphs, the first of which was as follows:

"1st.  The said LIL GORDY may dispose of her property in any way and manner that she sees fit, by will, gift or otherwise, and the said MAURICE UHRIG does hereby renounce any and all right, title, claim or interest in and to the property of the said LIL GORDY, in the event she should predecease him, except as expressly given under this instrument."

The agreement then provided:

"2nd.  The said MAURICE UHRIG, on his part, contemplates the execution of a will by which he gives his estate, or at least the major part thereof, to the said LIL GORDY, and in the event such will is executed, then the same shall be fully effective."

The third paragraph provided that plaintiff would have only such rights in the property of Mr. Uhrig

"as may be vested in her by will or by this instrument, but to no other extent whatsoever, and except as expressly given to her by will or by this instrument, the said LIL GORDY on her part likewise renounces all her right, title and interest in and to the estate of the said MAURICE UHRIG."

In the fourth paragraph it was recited that Mr. Uhrig owned his home, completely furnished, together with an automobile, certain savings, stocks and miscellaneous personal property.  In the event plaintiff should predecease him, the agreement provided that all of Mr. Uhrig's property should belong to him outright and that no gifts or conveyances made between the parties should change this provision, it be-

ing their intention that if plaintiff predeceased Mr. Uhrig, he would retain possession and ownership of all of his individual property.

The fifth paragraph recited that it was contemplated that plaintiff would move into the home of Mr. Uhrig.  It was thereupon agreed that in the event of the death of either of the parties, the entire contents of the home where they resided should belong to the survivor outright, regardless of the origin of the contents.  If any items had been taken from the home or loaned to other persons, they should be included and should pass to the survivor.  The instrument recited that some of the items which plaintiff expected to remove into the home were valuable and expensive, but plaintiff declared her intention for them to belong to Mr. Uhrig if he should survive.  The agreement expressly provided that her children should have no right to any of the contents of the home, except with the consent and agreement of Mr. Uhrig.

In the sixth paragraph plaintiff agreed to use the income from her residence to retire the mortgage thereon.  The seventh paragraph exonerated each of the parties for the debts of the other, except as assumed in writing and except for the obligation of the husband to support his wife.  In the eighth paragraph it was agreed that if plaintiff should become gainfully employed, any income received by her should be used for the joint support of the parties.

In the ninth paragraph there was the following provision:

"In the event the marriage between the parties should not work out, and there should be either a separation or a divorce, then insofar as their property is concerned, the parties shall be restored to the same exact position they presently occupy, with the property of each being returned to him, at which time, any and all transfers, gifts or conveyances between or among the parties shall be revoked and become void, to the end that the parties may be restored to their present situation, insofar as is reason-

ably possible, and there shall be no alimony or claims made by either party against the other. In the event of such separation or divorce, we both bind and obligate ourselves to separate in a peaceful and amicable way, without any malice each toward the other, but with the desire to be fair and considerate in all respects."

The agreement was made binding upon the heirs and representatives of the parties. It was acknowledged before a notary public and also witnessed so as to qualify as a testamentary disposition if necessary.

On April 29, 1977, the same date on which he changed the beneficiary on his life insurance policies and other business documents, Mr. Uhrig executed a will leaving his entire estate to plaintiff.

Discord developed between the parties toward the end of 1977, however, and on December 5, 1977, Mr. Uhrig executed another will, leaving all of his estate to defendants, who were the daughters of his former wife. On December 20, 1977, he filed suit for divorce alleging irreconcilable differences. Plaintiff answered on January 18, 1978, denying the allegations of the complaint. On February 6, 1978, Mr. Uhrig amended his divorce complaint to allege cruel and inhuman treatment. On the same day plaintiff filed an answer denying these allegations.

The parties became reconciled, however, and the divorce case never went to trial. Indeed it lay dormant for over four years, and was finally dismissed by the Chancellor on his own motion for failure to prosecute. Plaintiff testified that after their reconciliation, the parties lived together in a reasonable degree of harmony, although she said that Mr. Uhrig had a problem with excessive consumption of alcohol. She was in the hospital suffering with diabetes when he died on January 28, 1984.

As stated previously, the second will of Mr. Uhrig was admitted to probate and, insofar as the record before us reveals, has not been contested. Plaintiff has sought in the present case, however, to set up the first will, dated April 29, 1977, a copy of which some relatives furnished to her. She testified that the original will had been placed with the antenuptial agreement, but that it had disappeared some six months or more later. She said that she had never been able to locate it, and that Mr. Uhrig would not respond to her questions concerning it. She was unaware of the second will, dated in December 1977, until after the death of Mr. Uhrig.

The Chancellor expressed some reservations about the credibility of plaintiff. He construed the antenuptial agreement as not containing a binding contract on the part of the decedent to make a will in favor of plaintiff nor did he find that the execution of the will on April 29, 1977, made it irrevocable except by mutual consent of the parties.

The Court of Appeals affirmed this conclusion. It stated:

"The first thing we notice about the contract is the provision that says: 'It is the desire of each of us, ... that no property owned by either of us shall pass to the other on death, unless and until a will to that effect has been executed by us.' Then we note the provision in Paragraph 2 that says that Mr. Uhrig is 'contemplating' the execution of a will which, if executed, will be 'fully effective.'

"We conclude that the parties intended that the passing of any property from one to the other at death would result from the voluntary act of the owner in making of a will to that effect. Paragraph 2 does not require Mr. Uhrig to make a will, nor is it a promise to do so; it merely says that he has the present intent to make a will in which Mrs. Uhrig will be the principal beneficiary. But the making of the will is purely voluntary."

The Court of Appeals construed the remaining portion of paragraph 2, to the effect that if executed the will would be "fully effective," to mean that the antenuptial agreement would not be a defense to the effectiveness of the will. It did not find any intention on the part of Mr. Uhrig that a will, once executed, would be irrev-

ocable. It concluded, as did the Chancellor, that he was free to write a different will after the parties experienced marital difficulties in the latter part of 1977.

■ Although plaintiff argues strenuously to the contrary, we are of the opinion, that the decisions of the Chancellor and the Court of Appeals were correct, and that under all of the circumstances, there was no intention that either party be obligated irrevocably to make a will in favor of the other. The tenor of the agreement was that these two mature persons desired to keep their assets separate and for those assets to go to their children or other family members from previous marriages, except as specifically provided in the agreement or except as either might provide by a last will. The agreement especially emphasized that plaintiff wished her property to be kept separate, and it also was very clear that in the event of a divorce or separation, neither party would make any claim against the assets or property of the other.

It is clear from the terms of the antenuptial agreement that plaintiff is entitled to receive all of the household goods in the residence of the parties at the time of Mr. Uhrig's death. Under the fifth paragraph this is plainly expressed, and if the Administratrix has not delivered to plaintiff all of those assets, we now find and declare that the plaintiff is entitled to receive them exactly as set out in that portion of the agreement. Further, we find no basis for voiding any designation of insurance or other benefits which may have been in force at the time of the death of the decedent.

■ On the other hand we find nothing in the agreement which would totally void it for public policy reasons. Since the date of the agreement under consideration here, the General Assembly has expressly provided that prenuptial agreements shall be binding and effective if found to be entered into freely, and in good faith without exertion of duress or undue influence. 1980 Tenn. Pub. Acts, ch. 492, now codified as T.C.A. § 36-3-501.

In cases arising prior to the effective date of the statute, there is authority that provisions in pre-nuptial agreements attempting to limit liability for future alimony are not enforceable. *See Duncan v. Duncan*, 652 S.W.2d 913, 915 (Tenn. App. 1983). Sometimes a distinction has been made between such agreements and those involving reconciliation between married parties who are separated. *See, e.g., In re Estate of Montesi*, 682 S.W.2d 906 (Tenn. 1984); *Hoyt v. Hoyt*, 213 Tenn. 117, 372 S.W.2d 300 (1963).

In the present case there has been no attempt to enforce any limitation upon support or alimony. In the *Duncan* case, *supra*, the prenuptial agreement of the parties was carried out and not challenged, except the portion limiting alimony and attorney's fees. The insistence of appellant in the present case that the entire agreement should be deemed void is not well taken.

■ As previously stated, both courts below held that the provisions of the agreement were sufficient to waive any claim by plaintiff for an elective share as a surviving widow pursuant to T.C.A. § 31-4-101. The Court of Appeals pointed out that in T.C.A. § 31-1-102(b)(3) the term "surviving spouse" does not include:

"A person who was a party to a valid property settlement agreement or a valid proceeding concluded by an order purporting to terminate all marital property rights."

This statutory provision and definition were considered in detail in the recent case of *In re Estate of Montesi*, 682 S.W.2d 906, 911-12 (Tenn. 1984). There a reconciliation agreement was upheld as valid and was enforced according to its terms. Construing the quoted statutory provision, the Court said:

"We are of the opinion that only if the agreement purports to conclude all marital rights and to effect a full settlement thereof under all contingencies would it have the effect of waiving the right to dissent or other rights of a surviving spouse." 682 S.W.2d at 911.

We agree with both of the courts below that the provisions of the April 20, 1977, agreement under consideration here were sufficient to waive the elective share by plaintiff and that she is not "a surviving spouse" within the provisions of T.C.A. § 31–4–101.

The definition of a surviving spouse contained in T.C.A. § 31–1–102(b) does not include divorced persons or parties to valid property settlements "for purposes of this title...."

■ The other rights of a surviving spouse claimed by appellant do not arise under Title 31, but under Title 30. These are rights to exempt property, T.C.A. § 30–2–101, to a year's support, T.C.A. § 30–2–102, and to homestead, T.C.A. § 30–2–201. All of these are rights granted to "a surviving spouse." In our opinion it would be anomalous for the term "surviving spouse" to be defined differently for purposes of Title 30 from the definitions contained in Title 31. We do not believe that such was the legislative intent, and if plaintiff was not "a surviving spouse" for purposes of obtaining a distributive share by election, then, in our opinion, she should not be deemed a surviving spouse for purposes of the other statutory rights above referred to.

We agree with the Court of Appeals that in the case of *McAdams v. McAdams,* 177 Tenn. 67, 146 S.W.2d 140 (1941), the Court did lay down stringent rules concerning the waiving of marital rights, and that it did not enforce an antenuptial agreement in which there was not specific reference to certain of them. *See also Crenshaw v. Moore,* 124 Tenn. 528, 137 S.W. 924 (1911).

The entire statutory provisions governing intestate distribution and descent, together with those concerning definitions and the rights of surviving spouses, have been rewritten since the decisions in those cases. We are of the opinion that in the present case it was clearly the intention of each of these parties to waive all claims against the property or the estate of the other except as expressly set out in the fifth paragraph with respect to the household furnishings, and except as each might provide by will for the other. In our opinion the terms and provisions of the agreement were sufficiently clear and explicit to include any claim as a surviving spouse by either of the parties against the property and assets of the other. Accordingly we reverse so much of the judgments of the trial court and Court of Appeals as awarded plaintiff the exempt property, homestead and a year's support. We reiterate, however, that plaintiff does have rights under the fifth paragraph of the agreement which must be honored by the Administratrix and the beneficiaries of Mr. Uhrig's will.

The judgments of the courts below are affirmed in part, and reversed in part. The cause is remanded to the trial court for any further proceedings which may be necessary. Under the circumstances of the case, we deem it appropriate to tax the costs of the proceedings to the decedent's estate.

BROCK, C.J., and FONES, COOPER and DROWOTA, JJ., concur.