**IN THE COURT OF APPEALS OF TENNESSEE,**
**AT KNOXVILLE**

FILED

**June 10, 1998**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

_____

|   |   |   |
|---|---|---|
| **BONNIE WEBSTER GODFREY**, | ) | Knox County Chancery Court |
|  | ) | No. 127361-2 |
| Plaintiff/Appellant. | ) |  |
|  | ) |  |
| VS. | ) | C.A. No. 03A01-9708-CH-00319 |
|  | ) |  |
| **JOSEPH MORKHAM GODFREY**, | ) |  |
|  | ) |  |
| Defendant/Appellee. | ) |  |
|  | ) |  |

_____

From the Chancery Court of Knox County at Knoxville.
**Honorable Frederick D. McDonald, Chancellor**


**Virginia A. Schwamm**, TOWLE & SCHWAMM, Knoxville, Tennessee
Attorney for Plaintiff/Appellant.


**Wanda G. Sobieski**, SOBIESKI, MESSER & ASSOCIATES, Knoxville, Tennessee
Attorney for Defendant/Appellee.


OPINION FILED:

**AFFIRMED AND REMANDED**


**FARMER, J.**

**CRAWFORD, P.J., W.S.**: (Concurs)
**HIGHERS, J.**: (Concurs)

Plaintiff Bonnie Webster Godfrey (the Mother) appeals the final decree of divorce entered by the trial court which dissolved the parties' marriage, distributed their property, awarded custody of the parties' two minor daughters to Defendant/Appellee Joseph Markham Godfrey (the Father), and ordered the Mother to pay child support. On appeal, the Mother challenges the trial court's decision to award custody of the parties' children to the Father and the trial court's failure to award the Mother any proceeds of the Father's pension which he had liquidated during these proceedings. We affirm.

## I. Factual and Procedural History

The parties were married in 1978 when both were nineteen years of age. The parties' older daughter, Rachel, was born in September 1988, and Megan, was born in March 1992. In the fall of 1993, the Mother decided to attend law school at the University of Tennessee in Knoxville. Per the parties' agreement, the children, then ages one and four, remained with the Father in the marital home in Nashville while the Mother attended school. During her first year in law school, the Mother lived in an apartment in Knoxville during the week and returned to the marital home in Nashville every weekend.

After school was out in May 1994, the children moved to Knoxville to live with the Mother. The Father remained in Nashville to make repairs on the marital home prior to selling the home. Although the parties sold the marital home in October 1994, the Father continued to work and reside in Nashville because he did not believe that he could earn a comparable salary in Knoxville. During this time, the Father traveled to Knoxville every weekend to visit the family. After a time, the Father convinced his employer to allow him to work in Knoxville on Mondays and Fridays. Thereafter, the Father lived with the family in Knoxville four days per week.

In January 1995, the Mother told the Father that she was unhappy and wanted to go to marriage counseling because the marriage "was not working out." At first, the Father refused to go to counseling, but he agreed when, in May 1995, the Mother told him that she did not want to be married anymore. The parties attended marriage counseling for about three months during the summer of 1995, during which time the Mother failed to reveal either to the Father or to the

counselor that the Mother was engaging in an adulterous affair with a fellow law student. In August 1995, the Mother instituted these proceedings by filing a petition for divorce.

The Father moved to Knoxville to live with the family in October 1995. According to the Father, the move was one last attempt to save the parties' marriage. The Mother denied that the Father's move to Knoxville was part of a reconciliation attempt, but she acknowledged that the parties continued to have sexual relations after the Father moved in with the family. In order to move to Knoxville, the Father accepted a position with an engineering firm making $6,500 per year less than he made at his firm in Nashville. Around this time, the Mother told the Father about her adulterous affair; however, the Father continued to live with the Mother and the children because he wanted the marriage to succeed.

Despite the Father's efforts, the Mother decided in January 1996 that she wanted to proceed with the divorce. Consequently, in February 1996, the parties entered into an agreement to share joint custody of the children pending these proceedings. After graduation from law school in May 1996, however, the Mother was unable to find a legal position in Knoxville. In August 1996, therefore, the Mother accepted a position as a nursing instructor at East Tennessee State University (ETSU) in Johnson City. The Mother signed a nine-month contract with ETSU on August 1, 1996, and, on that date, filed a motion to revise the parties' "visitation schedule" in which she stated her desire to move to Johnson City and requested the trial court to modify the parties' "visitation arrangement" accordingly. The Mother did not deliver a copy of the motion to the Father's attorney until August 8, 1996, and, shortly thereafter, she moved with the children to Johnson City. The move occurred so quickly that the children were not given an opportunity to say goodbye to their school friends until a later date.

After conducting a hearing on the Mother's motion, the trial court entered an order permitting the Mother to move to Johnson City, finding that, (1) although the Mother had applied for over 100 legal and/or medical positions, the only job offer the Mother had received was the offer from ETSU, and that (2) the Mother's move "was not an effort to defeat co-parenting time, but [was] the result of economic necessity." The Mother later was offered a legal position by an attorney in Oak Ridge; however, she did not accept this position because she had just moved to Johnson City

and did not want to break her contract with ETSU. In the fall of 1996, the chancellor hearing this case recused himself, and the parties' divorce proceeding was assigned to another chancellor.

After the Mother's move to Johnson City, the Father faithfully exercised visitation with the children. Despite living two hours away, the Father frequently traveled to Johnson City to attend basketball games, choir performances, and field trips and other school activities with the children. Upon the recommendation of Rachel's counselor, the Mother offered the Father additional visitation time on Thursday evenings. Consequently, the Father began taking the children to dinner on Thursday evenings, even though to do so required him to drive over four hours in one evening. Although the Mother offered additional visitation time to the Father, the Mother would not permit the Father to pick up or return the children at the Mother's apartment complex. Instead, the Mother insisted on exchanging the children at a nearby shopping mall. One night when the Father returned the children early, instead of going to the mall, he went to the Mother's apartment complex, where he called her from the parking lot. Rather than coming to the parking lot to meet the children, the Mother called the police, who arrived and questioned the Father. This incident upset the children, and they later asked the Mother why she had called the police.

At trial, the Father testified that he believed he should be the children's custodian because the children always had been his priority in life and he had never put his job before the children. The Father indicated that, if awarded custody, he would continue to reside in the Sequoyah area of Knoxville, where the children could attend the same schools and church which they had attended in the past.

The Mother testified that she hoped to continue teaching at ETSU and that she had made no further efforts to find employment in Knoxville. She acknowledged that, when she enrolled the children in day-care in Johnson City, she neglected to provide the day-care facility with the Father's name, either as a parent or as an emergency contact. The Mother also acknowledged that she did not notify the Father of special events taking place at the children's day-care. The Mother formerly allowed the Father to pick up the children from day-care on the Fridays of his visitation weekends, but she now insisted that he pick them up at 6:00 p.m. because that was "what the agreement said."

In connection with these divorce proceedings, each party hired a psychologist to perform a custody evaluation. The Father's expert, Dr. Thomas P. Hanaway, testified that both parties were good parents and that the children were well-adjusted. The Mother's expert, Dr. Bernard F. Lyons, Jr., agreed. Dr. Lyons did not recommend any changes in the current custody arrangement, whereas Dr. Hanaway testified that the ideal situation would be if both parties still lived in the same city and shared joint custody. Neither expert, however, was willing to recommend one parent over the other as the children's custodian. The experts also agreed that, although the Mother had suffered from depression in the past, this condition did not currently present a problem for the Mother and would not impede her ability to parent the children.

In awarding the Father custody of the parties' children, the trial court made the following findings:

> 20. As to custody and visitation, the parties have each chosen a psychologist who has seen the parties and their children. Those experts both filed reports and testified but did not recommend a custodian for the children. Dr. [Hanaway] testified that he had rarely seen such competent parents, such well adjusted children and such a strong bond between the children and both of their parents. Despite the troubles that led to the divorce, he said both employed very good parenting skills with their children. Dr. Lyons' testimony was substantially in accord.
>
> . . . .
>
> 22. . . . The parties currently have an Order providing for joint custody of their children. The [Mother], however, objects to the joint custody provision being made permanent because of problems that have occurred. The Court agrees with the [Mother] that joint custody would not be appropriate in this case. . . .
>
> 23. The Court finds that the [Father] is low-keyed. The children's counselor in Johnson City recommended that they see him more. He has shown a degree of interest and taken part in the children's lives, . . .
>
> . . . .
>
> 25. The [Father], . . . has been available to take care of the children when [the Mother] was pursuing her education. He kept the children in Nashville for an extended period of time. He then left Nashville and moved to Knoxville to be with them. He has argued that he has placed the children's interest above his personal career goals, and the evidence tends to support that.
>
> 26. This was a close case based upon the present law. In the past, custody would be awarded to the mother under the Tender Years Doctrine. That Doctrine no longer prevails. There are many

considerations in deciding comparative fitness. One consideration is who has been the primary caretaker of the children. Due to the Court Order of August 1996, the [Mother] has been the primary caretaker, as she was permitted to take the children to Johnson City. However, the [Father] came in a close second, even during that period, in view of the extraordinary effort he made to have the children with him and visit them. The evidence shows that he has been a, if not the, primary caretaker.

27. Based upon the foregoing, this Court concludes that custody should be awarded to [the Father] with very extensive visitation to the [Mother].

## II. Custody and Visitation

In devising initial custody and visitation arrangements, trial courts are required to engage in a "comparative fitness" analysis, which requires the courts to determine which parent is a comparatively more fit custodian than the other. *Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. App. 1996). This inquiry is factually driven and requires the courts to carefully weigh numerous considerations, including

> the age, habits, mental and emotional make-up of the child and those parties competing for custody; the education and experience of those seeking to raise the child; their character and propensities as evidenced by their past conduct; the financial and physical circumstances available in the home of each party seeking custody and the special requirements of the child; the availability and extent of third-party support; the associations and influences to which the child is most likely to be exposed in the alternatives afforded, both positive and negative; and where is the greater likelihood of an environment for the child of love, warmth, stability, support, consistency, care and concern, and physical and spiritual nurture.

*Gaskill*, 936 S.W.2d at 630 (quoting *Bah v. Bah*, 668 S.W.2d 663, 666 (Tenn. App. 1983)); *accord Ruyle v. Ruyle*, 928 S.W.2d 439, 442 (Tenn. App. 1996).

Because "[c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves," appellate courts "are reluctant to second-guess a trial court's decisions." *Gaskill*, 936 S.W.2d at 631. Our review of these decisions is governed by the Tennessee Rules of Appellate Procedure, which require us to review the trial court's decision *de novo* upon the record with a presumption that the

trial court's findings of fact are correct unless the evidence preponderates otherwise. *Id*.; T.R.A.P. 13(d).

Applying the foregoing principles, we conclude that the trial court's custody decision in this case must be affirmed. Apparently, neither of the parties' experts considered one of the parties to be a comparatively more fit custodian than the other. The trial court, therefore, was called upon, after observing the parents' demeanor and judging their credibility, to make the determination of which parent should be awarded custody. After observing the parties and listening to their testimony, the trial court found that the Father had demonstrated the ability to serve as the children's primary caretaker and to place the children's interests above his personal interests. Although this was a "close case," the trial court ruled that the Father should be the custodian of the children, and we decline to disturb this ruling.

On appeal, the Mother insists that the trial court did not place great enough emphasis upon the factors of stability and continuity, and she points out that she has been the primary custodian and caretaker of the children since her move to Johnson City in August 1996. Because "stability is important to any child's well-being, the courts have emphasized the importance of continuity of placement in custody and visitation cases." *Gaskill*, 936 S.W.2d at 630. As this court has noted, however, continuity "does not trump all other considerations. Depending on the facts, a parent who has been a child's primary giver may not necessarily be comparatively more fit than the other parent to have permanent custody of the child." *Id*. at 630-31. Moreover, we note that the Mother herself disrupted the stability and continuity in the children's lives when she chose to move to Johnson City to accept employment there.

The Mother also complains that the visitation schedule set forth in the trial court's final decree does not award the Mother sufficient visitation time during the summer months. The Mother contends that, inasmuch as she teaches at ETSU for only nine months per year, the children should spend their summers with the Mother. As with the trial court's custody determination, however, we decline to disturb the visitation schedule set forth by the trial court. *See Jahn v. Jahn*, 932 S.W.2d 939, 942 (Tenn. App. 1996). In affirming this aspect of the trial court's decree, we note that the visitation schedule grants the Mother three separate two-week periods of visitation in the

summer, for a total of six weeks each summer. In addition to the six weeks of summer visitation, the decree also grants the Mother visitation with the children on the first and third weekends of every month throughout the year, including the summer months.

### III. Distribution of the Father's Pension Fund

As a final issue, the Mother contends that the trial court erred in failing to order an equitable division of the Father's retirement funds, which constituted a marital asset. The testimony at trial showed that the Father received $21,979 when he liquidated a pension fund from a former employer. The Father testified that he used these funds to pay his legal fees in this divorce proceeding. The trial court declined to make a distribution of the pension fund, finding that

> The funds were used for litigation expenses in which the [Father], to a significant extent, has prevailed. The funds were not used for his personal benefit, but to see to the well-being of the children.

The trial court, in its discretion, was authorized to make an award of attorney's fees to the Father because the primary issue adjudicated in the divorce proceedings below was the custody of the parties' children and because the Father ultimately was awarded custody of the children. *See* T.C.A. § 36-5-103(c) (1996) (authorizing trial court to award spouse to whom custody of children is awarded reasonable attorney's fees incurred in regard to any suit or action concerning adjudication of custody, both upon original divorce hearing and at any subsequent hearing). Accordingly, we hold that the trial court properly allowed the Father to retain the Mother's portion of his pension fund as an award of attorney's fees incurred in adjudicating the custody issue below.

On appeal, the Mother insists that the award must be reversed because the Father failed to submit sufficient proof of the amount of his attorney's fees. After reviewing the evidence presented below, however, we conclude that the record contains a sufficient basis to support the trial court's award. *See Kahn v. Kahn*, 756 S.W.2d 685, 696-97 (Tenn. 1988); *Hennessee v. Wood Group Enters., Inc.*, 816 S.W.2d 35, 36-37 (Tenn. App. 1991). At trial, the Father testified that he spent the entire proceeds of the pension on funding this litigation. Moreover, the Mother herself testified that she had incurred over $10,000 in attorney's fees and court costs even prior to the

commencement of trial. Under these circumstances, we hold that the award of attorney's fees made by the trial court represents a reasonable and proper fee in this case. We decline, however, to award the Father any additional attorney's fees which he may have incurred on appeal.

The final divorce decree entered by the trial court is affirmed. Costs of this appeal are taxed to the Mother, for which execution may issue if necessary.

_____
FARMER, J.

_____
CRAWFORD, P.J., W.S. (Concurs)

_____
HIGHERS, J. (Concurs)